**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ADEEL AFRIDI,

Plaintiff,

v.

BNSF RAILWAY COMPANY,

Defendant.

Case No. 18-CV-8205

Judge Mary M. Rowland

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant BNSF Railway Company fired Plaintiff Adeel Afridi, a private law enforcement officer it employed, after learning that Plaintiff threatened to kill his coworkers at a company casino night event. Plaintiff denies making any such threat and claims that Defendant fired him because of his religion, national origin, and race and in retaliation for complaining about discrimination. Plaintiff also alleges that Defendant retaliated against him by failing to reinstate and rehire him after his termination. To redress his alleged injuries, Plaintiff brings a two-count complaint for discrimination under the Illinois Human Rights Act (IHRA) and retaliation under Title VII of the Civil Rights Act of 1964. Defendant moves for summary judgment on both claims. [103]. For the reasons explained below, this Court grants Defendant's motion.

### **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND

As a preliminary matter, Defendant raises evidentiary objections regarding Plaintiff's response to Defendant's statement of facts and statement of additional

facts. This Court maintains broad discretion to enforce the local rules governing summary judgment motions, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008), and addresses Defendant's evidentiary objections before turning to the facts of the case.

Defendant first asks this Court to deem admitted fifty-seven of its statement of facts because Plaintiff's response either "admits" or "denies" with non-material aspects of the statement, or in other instances, "denies" a statement but cites the very same evidence Defendant cites in support of the statement, cites other parts of the record that say materially the same thing as Defendant's citations, or cites evidence that fails to refute the statement. [119] at 7–8. This Court declines to strike these responses wholesale and will evaluate them on a case-by-case basis, as pertinent to the analysis. *See, e.g.*, *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1020 (N.D. Ill. 2018) ("Rather than attempt to winnow the voluminous statements to only material paragraphs in the abstract, the court . . . deems addressing materiality questions as they pertain to particular issues to be the better course because it may obviate the need to analyze each disputed paragraph."). This Court likewise declines at the outset to deem admitted those of Defendant's facts to which Plaintiff responds with an "inadmissible hearsay" objection. [119] at 8–9; *see* PRSOF ¶¶ 2, 3, 10, 13, 18, 20, 32, 57, 58, 78, 79, 80. This Court will evaluate these on a case-by-case basis as needed below.

Defendant moves to strike portions of paragraphs 10 and 15 of Plaintiff's additional facts. [119] at 9–10. In paragraph 10, Plaintiff speculates that it "was apparent to him" that a colleague "did not appreciate Islam or Muslims because she took great offense" to Plaintiff's nonparticipation in a work event. PSAF ¶ 10. In paragraph 15, Plaintiff speculates about another individual's impressions of that colleague's state of mind. *See id.* ¶ 15 ("It was apparent to Holland both on the night of the event and during the phone conversation that Little was affronted by [Plaintiff] and Emmett's comments about not wanting to be in Topeka."). This Court agrees that these portions of the facts amount to rank speculation about another individual's state of mind, and thus, strikes them from the summary judgment record. *See* Fed. R. Evid. 602.

Defendant also moves to strike paragraphs 33, 37, and 40 of Plaintiff's statement of additional facts due to their "excessive length and impermissible assertion of many, many facts within a single paragraph." [119] at 10. This Court overrules this request. Nothing in Local Rule 56.1 instructs parties to include only one fact per paragraph. Moreover, where Plaintiff includes multiple facts per paragraph, such facts "are logically grouped and the combinations make sense in context." *Maher v. Rowen Grp., Inc.*, No. 12 C 7169, 2015 WL 273315, at *7 (N.D. Ill. Jan. 20, 2015).

Defendant asks this Court to disregard paragraphs 24 and 25 of Plaintiff's statement of additional facts, arguing that the support for those facts come from one of Defendant's internal policies that does not apply to Plaintiff. [119] at 10. This Court

4

declines Defendant's request. To the extent Defendant believes Plaintiff misplaces reliance on a particular piece of evidence, it of course remains Defendant's prerogative to highlight those deficiencies in his response. There is no basis, however, to strike them.

Defendant also moves to strike the unsigned declaration of Mary C. Gunn, which Plaintiff relies on in his responses to Defendant's statement of facts. [116] at 1; *see, e.g.*, PRSOF ¶ 10; *see* [113-27]. Under 28 U.S.C. § 1746, an unsworn declaration which is dated and signed by the declarant "under penalty of perjury" and verified as "true and correct" may be used in lieu of a sworn affidavit to support or respond to a motion for summary judgment. *Aberman v. Bd. of Educ. of City of Chi.*, 242 F. Supp. 3d 672, 677 (N.D. Ill. 2017). Here, however, Gunn's declaration is unsigned and unsworn and thus inadmissible under Section 1746. *See id; see also Price v. Fed. Bureau of Prisons*, No. 21 C 542, 2022 WL 972294, at *4 (N.D. Ill. Mar. 31, 2022) (striking the plaintiffs' unsigned declarations from the summary judgment record); *Rivera v. Allstate Ins. Co.*, 140 F. Supp. 3d 722, 729 (N.D. Ill. 2015) (disregarding unsigned declarations on summary judgment); *Est. of Davis v. Wells Fargo Bank*, 633 F.3d 529, 540 & n.5 (7th Cir. 2011) (noting that the district court properly granted a motion to strike declarations that were "not signed, dated, or notarized"). This Court grants Defendant's motion to strike [116] and disregards Gunn's declaration.

With these evidentiary issues resolved, this Court turns to the background facts, which it takes from Defendant's statement of facts (DSOF) [104], Plaintiff's

response to Defendant's statement of facts (PRSOF) and statement of additional facts (PSAF) [110], and Defendant's response to Plaintiff's statement of additional facts (DRSAF) [117].

## I. Parties

Defendant operates a freight railroad company. DSOF ¶ 1. Plaintiff is a dark-skinned, Pakistani-born, Muslim male. PSAF ¶ 1.

Defendant maintains a private armed police force comprising approximately two hundred sworn law enforcement officers who, among other duties, patrol Defendant's railroad track and facilities. DSOF ¶ 9. As a result of the merger of the Burlington Northern and Atchison Topeka Railroads, Defendant's law enforcement force at one time was comprised of a combination of unionized, non-exemption positions, also referred to as "scheduled positions," of "Patrolman" and "Senior Patrolman," as well as exempt officers who held the position of "Special Agent." DSOF ¶ 10. The Patrolmen, Senior Patrolmen, and some of the exempt Special Agents paid union dues to the Transportations Communication Union. *Id.* Since 2013, Defendant has phased out the scheduled positions by permitting officers holding these positions to convert to exempt Special Agent positions and by placing every newly hired officer into the position of exempt Special Agent. [104-16] ¶ 5.[1]

In November 2016, Defendant hired Plaintiff and Robert Emmett, a Caucasian, American-born, non-Muslim, as law enforcement officers bearing the title

---

[1] Merrell's declaration is based on his personal knowledge and therefore admissible on summary judgment. *See Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014); *contra* PRSOF ¶ 10.

"Special Agent." *Id.*; DSOF ¶ 12. Plaintiff and Emmett worked out of Defendant's Cicero, Illinois trainyard and, like all Chicago-area Special Agents, reported to Assistant Chief of Police for the Northeast Corridor, Jeffrey Savage. DSOF ¶ 12.

Defendant's Code of Conduct, which applies to all of Defendant's officers, states that "violent or threatening conduct has no place at BNSF." *Id.* ¶ 5. Defendant's officers are subject to Defendant's Resource Protection Code of Conduct, which states in relevant part that all "BNSF Railway police officers . . . will at all times be courteous and exercise patience and discretion in dealing with the public." *Id.* ¶ 7. Defendant's Employee Safety Rules, which applies to all employees, prohibits employees from engaging in acts of "hostility, misconduct, or willful disregard or negligence affecting the interest of the company," as well as "dishonest, immoral, quarrelsome [or] discourteous" behavior. *Id.* ¶ 6. The parties agree that Defendant can respond to employee violations of any of its policies, rules, or codes of conduct with disciplinary action. DSOF ¶ 8; PRSOF ¶ 8. The parties also agree that serious violations, including engaging in or threatening violence, can result in immediate termination, even for employees who do not have any prior discipline. DSOF ¶ 8; PRSOF ¶ 8.

## II. Casino Night at the AOT

Defendant requires all sworn officers to attend one of four week-long trainings it offers each year, referred to as "Annual Officer Training" (AOT). DSOF ¶ 14. Defendant conducts the training at its facility in Topeka, Kansas, and officers in attendance stay in a nearby hotel. *Id.* Plaintiff and Emmett attended the AOT in

Topeka during the week of May 22–26, 2017. *Id.* ¶ 15. On the second day of training, Tuesday, May 23, Defendant hosted a casino-themed fundraising event at the officers' hotel. *Id.* ¶ 15; PRSOF ¶ 15. Defendant served dinner, soft drinks and beer, and hired a vendor, Takila Holland (an African American individual), to provide materials and staff to oversee casino games. DSOF ¶ 15.

Because of his religion, Plaintiff does not drink or gamble. PSAF ¶ 5. He did not feel comfortable being around people engaging in those activities at the casino night event and therefore left to sit in the hotel lobby. *Id.* While the fundraiser remained ongoing in a hotel conference room, Plaintiff and Emmett sat talking in the hotel lobby. DSOF ¶ 16. Takila Holland, Defendant's vendor, entered the lobby and sat down next to Plaintiff and Emmett. *Id.* The three talked in the lobby for about an hour. *Id.* During the conversation, Holland commented to Plaintiff that he "did not look like he was having any fun." *Id.* ¶ 17. Plaintiff responded that he "missed his wife" and that he "felt homesick." *Id.* Plaintiff stated his job with Defendant "was very slow" compared to his previous police position, where he "was involved in some gruesome crime scenes." *Id.* Plaintiff proceeded to tell Holland: "I still remember this crime scene. It was a domestic where a lady had been cut with a razor blade in her major artery. And it's not the same as getting a cut regularly because major artery, every time your heart pumps, it comes out. And I told her, like, the blood on the floor was, like, onto my boots." *Id.* Plaintiff told Holland he left his prior law enforcement job due to burnout from having to deal with gangs and gun violence. PSAF ¶ 7.

8

Waynette Little (an African American individual) entered the lobby. DSOF ¶ 18. Unbeknownst to Plaintiff and Emmett, Little served as the administrative assistant to Defendant's Chief of Police, Greg Sandsness, in Fort Worth, Texas, and facilitated the logistics of the AOT. *Id.* ¶ 18. When Little joined the conversation, Emmett told her "he had retired from county and, you know, he was greedy and wanted to build up his nest egg. That's why he was at BNSF." *Id.* ¶ 19. Plaintiff told Little he had taken a pay cut to come work for Defendant, and referring to Topeka, said "I hate this place," "nobody wants to be here," "Topeka, Kansas sucks," and "there's nothing for me to do here." *Id.* Emmett said, "it's 40 degrees and raining, there's no place for us to go." *Id.* Little agreed with Plaintiff "that Topeka sucks," adding that it may not be the best place "but it is what it is." PSAF ¶ 9. Little suggested they bring their concerns to Chief Sandsness and left the conversation. DSOF ¶ 19; PSAF ¶ 10.

After Little left the conversation, Holland, Emmett, and Plaintiff continued to talk. PSAF ¶ 11. Holland told them she was considering entering the crime scene cleanup business, and Plaintiff replied she should because it is lucrative. *Id.* ¶ 11. The three talked about crime scenes and discussed "some gory details." *Id.* At the conclusion of the casino night event, Holland attempted to provide feedback about the event to Little, but Little brushed her off. *Id.* ¶ 12. Holland responded by telling Little that she would email the feedback to her. *Id.*

Later that evening, while Holland was in Little's hotel room, Little apologized to Holland for brushing her off and told her that she would contact Holland to obtain

her feedback once she returned to Texas. *Id.* ¶ 13. Instead of waiting, however, Little called Holland the next day, and the two discussed the conversation with Plaintiff and Emmett during the casino night event. *Id.* ¶ 14. Little testified at her deposition that Holland told her the two gentlemen—Plaintiff and Emmett—kept complaining after Little left the conversation and that Plaintiff said something like, "we should go in there and kill them all," and that Mr. Emmett agreed. DSOF ¶ 20; [104-9] at 10.[2] As Little testified in her deposition, if "someone says they're going to kill anybody anywhere, whether it's in casino night or down the street, in the world we live in you don't take that lightly." *Id.* Little testified also that Holland told her "I don't know if they were joking or not, but it made me nervous." *Id.* at 11.[3]

---

[2] Plaintiff's hearsay objection to Little's deposition testimony is overruled. *Contra* PRSOF ¶ 20. Little is testifying as to Holland's statement to her about what Plaintiff told Holland. Under Rule 805, both levels of hearsay must come within exceptions to the hearsay rule for hearsay within hearsay to be admissible. Both the inner layer—Plaintiff's statements to Holland—and the outer layer—Holland's statements to Little—must fall within a hearsay exception or exclusion to be admissible. *Halloway v. Milwaukee County*, 180 F.3d 820, 824–25 & n.4 (7th Cir. 1999). Because Plaintiff is a party, his statements to Holland are admissible as opposing party statements under Rule 801(d)(2)(A). In addition, Defendant does not offer Plaintiff's or Emmett's statements for the truth of the matters asserted—namely, that Plaintiff and Emmett were actually going to go into casino night and kill the attendees. Rather, Defendant offers them to show their effect on Holland, who then reported the statement to Little. *See Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019) ("Statements introduced to show their effect on the listener, rather than the truth of the matter they assert, are not hearsay."). Defendant also uses the statements from Plaintiff and Emmett for the non-hearsay purpose of showing that the statements were made to Holland. *See McKinney v. Chi. Transit Auth.*, No. 20 C 6093, 2022 WL 2257246, at *4 (N.D. Ill. June 23, 2022) (noting that statements are non-hearsay "because they are being used only to prove that the prior statements had been made"). Similarly, the statement that Holland conveyed to Little is non-hearsay because Defendant offers them to show the effect on the listener, Little, rather than for their truth. *See Buford v. Laborers' Int'l Union Loc. 269*, No. 16 C 10218, 2019 WL 184052, at *6 (N.D. Ill. Jan. 14, 2019) (holding that both levels of statements were non-hearsay because they were offered to show the effect on the listener), *aff'd*, 787 F. App'x 341 (7th Cir. 2019).

[3] Again, this statement from Holland to Little is not hearsay because Defendant offers it to show its effect on Little. *Torry*, 932 F.3d at 585; *contra* PRSOF ¶ 20.

### III. The Next Day

The next day, while Savage was attending a training session, Little approached him and requested to speak to him. PSAF ¶ 18. Little told Savage about the conversation she had with Plaintiff and Emmett where they referenced "BNSF being a fraud, this place sucks," and "the food's garbage." *Id.* Little alleged to Savage that Plaintiff made a comment about "shooting" people and that Emmett would back "the comments up." *Id.* Little told Savage that each of the comments were made to her and in Holland's presence. *Id.* Savage asked Little to provide him with Holland's contact information. *Id.*

When Savage called her, Holland told Savage "something about someone killing someone." [104-7] at 2. Savage asked Holland if she would be willing to put her statement in writing and, if necessary, if she would be willing to testify at a company investigation. DSOF ¶ 21. Holland agreed to both, and Savage told her that someone from Defendant's human resources department may contact her. *Id.* Savage also requested that Little draft a statement memorializing her communications with Emmett, Holland, and Plaintiff. *Id.* ¶ 23. Little provided her statement to Savage on May 24, 2017. *Id.*

Also on May 24, 2017, Savage and Little met with Deputy Chief Charles (Ted) Dimmick and informed him of Holland's report that Plaintiff and Emmett had made threats about "shooting people," and also of Little's comments she allegedly heard that BNSF was a "fraud, this place sucks, food is garbage." *Id.* ¶ 24; PSAF ¶ 20; DRSAF ¶ 20. Savage asked Dimmick to check on Emmett and Plaintiff and ask if

"there were any issues with them." DSOF ¶ 24. Dimmick found them in training class; he spoke with Emmett briefly and "was satisfied that Emmett had no issues or problems." *Id.* Plaintiff told Dimmick, however, that his wife was at home sick with "severe pinkeye," his "grandma had passed away," and that he was "having trouble sleeping at night." *Id.* At Savage's direction, Dimmick offered Plaintiff the option to leave AOT and go home if he wished. *Id.* ¶ 25. Plaintiff declined to do so. *Id.* Dimmick then reported to Savage that Plaintiff chose to stay at AOT. *Id.*

### IV. Defendant's Investigation

Savage then spoke to Deputy Chief Grant Bidwell, who was in Chicago, and told him about an incident involving Emmett and Plaintiff potentially making threats. *Id.* ¶ 26. Savage also emailed Acting Chief of Police Jeff Briggs and Brian Williams, Assistant Chief of Defendant's Special Investigations Team (SIT). *Id.* ¶ 27. Savage provided them with Little's and Holland's statements. *Id.*

On May 30, 2017, Savage contacted Mary Sanchez, Human Resources Manager for Defendant's Chicago Division, who regularly conducts employee investigations. *Id.* ¶ 28. Savage informed Sanchez of the reports he received from Little and Holland, provided Little's statement, Holland's statements, and his own summary of what transpired at AOT. *Id.*

The next day, May 31, 2017, Plaintiff sought out Deputy Chief Bidwell and advised him he might hear about an incident at AOT. *Id.* ¶ 30. Plaintiff told Bidwell he had been upset over his grandmother and wife during AOT week, that it "may

have thrown his personality off a little bit," and he was afraid that "his comments to Little were a bit out of line" and he "did not realize who she was at the time." *Id.*

Sanchez interviewed Plaintiff and Emmett separately on June 1, 2017. *Id.* ¶ 31. During Plaintiff's interview, with his supervisor Savage also present, Plaintiff shared with Sanchez that his religious beliefs prevented him from gambling or drinking alcohol at the casino night event. PSAF ¶ 22. When Sanchez stepped away for a moment during the interview, Savage told Plaintiff that a lot of people put a lot of work into providing the AOT sessions. *Id.* Savage said that if Plaintiff did not wish to participate in the event, he should have just stayed in his hotel room. *Id.* When Sanchez asked Plaintiff, "Did someone say, quote 'I'll kill these fuckers,' end quote," Plaintiff responded, "I don't know, I don't know, I don't think anyone said I'll kill these fuckers." DSOF ¶ 33. Plaintiff also denied that Emmett said, "I'll help you." *Id.*

In her separate interview with Emmett, Sanchez asked Emmett if he said "I'll help you" in response to Plaintiff's "I'll kill these fuckers," and Emmett denied making that comment. *Id.* ¶ 32.[4]

The next day, June 2, 2017, Plaintiff broke down and cried in front of Savage at work. *Id.* ¶ 34. Savage told Plaintiff he should allow Sanchez to conclude its investigation and instructed him to reach out to Sanchez to "talk to her about how [Plaintiff] was feeling." *Id.* Savage documented the interaction in an email to Savage. *Id.*

---

[4] This Court overrules Plaintiff's hearsay objection to DSOF ¶ 32. *See* PRSOF ¶ 32. Defendant offers Emmett's statement for the non-hearsay purpose of showing that he made the statement to Sanchez. *See McKinney*, 2022 WL 2257246, at *4.

On June 5, 2017, Sanchez interviewed Deputy Chief Dustin Marvel who had presented AOT sessions during the week of May 23. *Id.* ¶ 35. Marvel opined that Plaintiff and Emmett were less than enthusiastic in their participation in some of the training sessions, with Emmett plainly demonstrating a "bad attitude from the beginning." *Id.*

Sanchez also interviewed Holland on June 5; during this interview, Holland reiterated that Plaintiff and Emmett complained extensively about their positions and the training and had made threats that they would kill "the guys they were training with." *Id.* ¶ 36. When Holland spoke about the comment that Plaintiff would kill "the guys they were training with," Sanchez formed the impression that Holland "took it as a joke." [104-17] at 30.

On June 6, 2017, Plaintiff called Sanchez and asked to meet with her. DSOF ¶ 37. When Plaintiff met Sanchez at her office, he told Sanchez, among things, that he told Little he was bored and said "fuck Topeka" or "fuck this place"; he told Little he took a pay cut to work for Defendant; and that he, Emmett, and Holland talked about cleaning up crime scenes. *Id.* At the conclusion of this meeting, Sanchez asked Plaintiff to review her notes and initial each page. *Id.* ¶ 38. According to Sanchez, Plaintiff began to initial each page without reading what Sanchez had written; when Sanchez stopped him and offered to read the notes, Plaintiff laughed and said, "I saw you writing and you didn't put that I said I was going to kill a bunch of people in there, did you?" *Id.* For his part, Plaintiff asserts that he was in "disbelief that anyone would think that I was capable of threatening to kill someone." [113-5] ¶ 15.

At some point during the investigation, Plaintiff informed Sanchez that he was being targeted because of his race and religion. PSAF ¶ 24. Emmett also told Sanchez that Plaintiff was Muslim and that he believed Little was way out of line. *Id.* Plaintiff told Sanchez and Courtney Johnson, Regional Director of Human Resources, during his second interview that "he was being targeted." *Id.*; DSOF ¶ 43.

On June 7, 2017, Sanchez interviewed Little. DSOF ¶ 39. Little told Sanchez in detail the complaints Plaintiff and Emmett made to her about Defendant, their positions, AOT and Topeka, and their use of profanity. *Id.*

Based on her interviews and witness statements, Sanchez concluded that Emmett and Plaintiff "were out of line in the conversation," and displayed an "indifference to duty" and "disinterest in being at a training that was required of them to really learn their job." *Id.* ¶ 40. Sanchez also formed the belief that Plaintiff said "I'll kill these fuckers" and that Emmett said "I will help you," but believed these were comments "made in jest" and "didn't believe that they were actually threatening . . . the room." [104-17] at 51. Sanchez believed that Plaintiff was lying when he denied making the threats about killing his coworkers. *Id.* at 48.

Sanchez conferred with Courtney Johnson regarding the evidence she collected and summaries of the evidence. DSOF ¶ 43; [104-8] at 3; [104-17] at 52. According to Sanchez, although she supported the decision to terminate both Plaintiff and Emmett, she did not make the final termination decisions; someone above her did. [104-17] at 52. Specifically, Holly Morgan, Assistant Vice-President of Human Resources, recommended to Assistant Vice President of Resource Protection Chuck

Matthews that Plaintiff and Emmett be terminated. [104-14] at 4; DSOF ¶ 12. After reviewing the recommendation and the synopsis of the investigation from human resources, Matthews ultimately made the termination decisions, with input from Savage. [104-8] at 4; PRSOF ¶ 44; [104-11] at 15. As Matthews testified, the synopsis from human resources recommended termination because "of the comments made" and the "belief [Plaintiff] and Emmett were not forthright or honest." [104-11] at 16. Matthews read the findings and "agreed termination was appropriate." *Id.* Morgan then forwarded her summary of human resources' investigation and findings and an email exchange with Matthews stating their position that "termination was warranted" to Matthews' supervisor, David Freeman, Executive Vice-President of Operations. DSOF ¶ 46. Morgan stated: "We reviewed the investigation with [the law department] and believe given the higher standard of conduct for our officers that both individuals should be terminated." *Id.* Freeman responded, "The plan works for me." *Id.*

### V. Termination and Plaintiff's Disciplinary Investigation

On July 9, 2017, Savage, Dimmick, Bidwell, and Johnson met with Plaintiff and Emmett each separately to terminate their employments. DSOF ¶ 47. Savage read Plaintiff and Emmett the brief termination letters that the Human Resources department had drafted, which stated, in relevant part "the principle [*sic*] cause is your failure to meet the company's conduct expectations for a BNSF police officer." *Id.*

16

After his termination, Plaintiff contacted his union representatives, and relying on their instructions, requesting a formal hearing. *Id.* ¶ 48. On July 27, 2017, Defendant conducted the disciplinary investigation and hearing, during which Plaintiff, with the aid of union representation, had the opportunity to present evidence, call witnesses, and question and cross-examine Defendant's witnesses. *Id.* ¶ 52. Based on the evidence presented at the hearing, Defendant determined that Plaintiff's conduct violated Employee Safety Rule 28.6 and Resource Protection Code of Conduct Rule 4.0. *Id.* Following the disciplinary hearing, Defendant dismissed Plaintiff in accordance with its Policy for Employee Performance Accountability (PEPA), which provides that certain conduct can lead to "stand alone dismissal," including "violence in the workplace," and specifically, "the threat of using weapons." *Id.* ¶¶ 51, 52. PEPA provides standards for Defendant to determine the appropriate disciplinary response to an employee's conduct when Defendant reviews that conduct through a formal discipline investigation. *Id.* ¶ 51; [104-16] ¶ 8.

After the union appealed the termination outcome, Defendant upheld the termination decision. DSOF ¶ 53. The union then sought an arbitrator's ruling on whether Defendant properly dismissed Plaintiff. *Id.* That arbitration took place in December 2019; on December 19, the arbitrator issued Award No. 65, finding in relevant part that Plaintiff "clearly violated the code of conduct with his behavior on the evening of May 23" but "that the two and [*sic*] half plus years that he has been out of service is punishment enough for his offense and [*sic*] will direct that [Plaintiff]

be restored to scheduled service with his seniority unimpaired but without pay for lost time." *Id.* ¶ 54.

### VI. Plaintiff's Furlough

After the arbitrator's ruling, Defendant added Plaintiff back to the seniority roster, with his seniority unimpaired by being out of service since August 2017 and determined Plaintiff medically fit for duty. *Id.* ¶ 55. As of February 2020, when Defendant completed these steps, Defendant employed three officers in "scheduled positions": L.D. Hopson, F.C. Oliver, and Brian Sheehan. *Id.* ¶ 56. Hopson held his position since May 2006, Oliver his since May 2008, and Sheehan his since August 2012. *Id.* According to the declaration of Donald J. Merrell,[5] Defendant's Director of Labor Relations, as of February 2020, there was no scheduled position available for Plaintiff to hold. [104-16] ¶ 16.

Merrell asserts that, as of February 2020, Plaintiff had less seniority than the three Senior Patrolmen—Hopson, Oliver, and Sheehan—and could not, under a governing collective bargaining agreement, displace any of them from their positions as he was junior to them. *Id.* ¶ 18. Merrell attests that when no position is available to an employee paying union dues to occupy following an order of reinstated seniority, Defendant furloughs the employee until a position for which the employee is qualified, and for which he has sufficient seniority, becomes available. *Id.* ¶ 19.

---

[5] Again, this Court overrules Plaintiff's hearsay objection; Merrell's declaration is based on his personal knowledge and therefore admissible on summary judgment. *See Univ. Healthsystem*, 68 F. Supp. 3d at 921; *contra* PRSOF ¶ 57.

Because Defendant had no scheduled position for Plaintiff to hold, Defendant placed Plaintiff on furlough status. *Id.* ¶ 21; DSOF ¶ 58.

In response, the union sought further review by the arbitrator, arguing that Defendant should be required to return Plaintiff to an exempt Special Agent position rather than furlough him as a Patrolman. *Id.* ¶ 59. The arbitrator found in favor of Defendant and in a July 29, 2020 "interpretation to Award No. 65" held: "The Board in its decision restored [Plaintiff] to scheduled service. Scheduled service, and by reference, a scheduled position or scheduled employee, is . . . referring to positions or employees fully covered by the provisions of an applicable labor agreement. A scheduled employee is not an exempt employee." DSOF ¶ 59.

### VII. Plaintiff's Applications for Special Agent Positions

In September 2020, May 2021, and September 2021, Plaintiff applied to Special Agent positions in the Chicago area. *Id.* ¶ 60. According to Kimonisha Stubblefield, Defendant's Human Resources Manager, none of those applications advanced past an initial review conducted by the Human Resources staff. [104-21] ¶ 11.

Stubblefield herself reviewed Plaintiff's September 2020 application, and upon seeing that Plaintiff was a furloughed employee, rejected his "external candidate" application. *Id.* ¶ 13. Stubblefield attests that Defendant expects that furloughed employees designate themselves as "internal," not "external," candidates when they apply for other positions within the company. *Id.* ¶ 12. In May 2021, Plaintiff once again applied as an "external candidate," and Stubblefield's colleague, LaKeisha

Freeman, rejected his application, "again due to his improper submission." *Id.* ¶ 14. Stubblefield additionally attests that Plaintiff's September 2021 application was rendered automatically ineligible due to a response to a qualifying question; Plaintiff responded "no" to the question "I am currently a fulltime peace officer in the State of Illinois or I will be upon the date of hire." *Id.* ¶ 16. Any "no" answers to qualifying questions automatically disqualified a candidate. *Id.* ¶ 15.

According to Stubblefield, Human Resources never informed Chuck Matthews that Plaintiff submitted applications for the Special Agent positions in 2020 and 2021 and did not request that Matthews provide any input on his applications. *Id.* ¶¶ 20–21.

## VIII. Plaintiff's Claims of Discrimination and Retaliation

Plaintiff claims that Defendant terminated him, instead of responding with lesser discipline, because of his national origin, race, and religion. DSOF ¶ 66. He contends that: (1) Defendant knew he was Pakistani because he submitted a birth certificate during his hiring process; (2) when he attended AOT, an Ariana Grande concert in London "was bombed by terrorists" and Plaintiff believes fellow officers looked at him and made comments about the bombing; (3) Little and Holland were inconsistent in their statements about Plaintiff's conduct and influenced "due to his environment and the circumstances surrounding Muslims at the time in the media"; and (4) Savage allowed him to continue working and did not confiscate his weapon following Plaintiff's comments at AOT. *Id.* ¶ 67.

Plaintiff never heard any of Defendant's supervisors make a disparaging comment about his or any employee's race or religion or national origin. *Id.* ¶ 68. During AOT, no officer made a comment to Plaintiff personally, and no one mentioned Pakistan in reference to terrorism or the Ariana Grande concert. *Id.* Nor can Plaintiff describe anything that anyone said specifically about these issues. *Id.* Like Plaintiff, Defendant allowed Emmett to continue working following his return to Chicago from the AOT and did not confiscate his weapon until terminating his employment. *Id.* ¶ 69.

In support of his claim that Defendant terminated him on account of his religion, Plaintiff contends that Little "took personal offense against me not participating and alleged that he was being quarrelsome and discourteous" because of "how Muslims feel about gambling and alcohol" and that he is the only Pakistani-born Muslim Defendant ever employed as a Special Agent. *Id.* ¶ 71. And in support of his claim that Defendant terminated him because of his race, Defendant testified that Defendant jumped to termination because "I don't look white American." *Id.* ¶ 72.

Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights (IDHR), alleging that Defendant illegally discharged him on July 9, 2017 because of his national origin, Pakistani; perceived race, East Indian; and religion, Islam. PSAF ¶ 2. He also alleged retaliation for not participating in casino night due to his religion. *Id.* Plaintiff also claims that Defendant retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity

Commission (EEOC) on November 30, 2020 by failing to hire him for any Special Agent positions for which he applied in 2020 and 2021. *Id.*; DSOF ¶ 73. Plaintiff concedes that Defendant did not place him in a Patrolman position because "[t]hey don't offer patrolmen positions anymore" and that he is not aware of any officer with less seniority than him who is working as a Patrolman. [104] ¶ 73. Plaintiff concedes also that he has no reason to believe that Matthews, or anyone outside of Human Resources, knew he applied for the 2020 and 2021 positions. *Id.*

## ANALYSIS

In Plaintiff's amended complaint, he brings claims for race, national origin, and religious discrimination under the IHRA (Count I) and retaliation under Title VII (Count II). [71] ¶¶ 31–41. Defendant moves for summary judgment on both claims, which this Court will address in order below.

### I.     IHRA Discrimination Claim

The Court begins with Plaintiff's discrimination claim under the IHRA. Courts apply the well-established Title VII legal standard to IHRA discrimination claims. *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) (observing that the "legal standard is the same under" Title VII and the IHRA). Plaintiff may defeat summary judgment by proceeding under one or two cognizable frameworks for evaluating discrimination claims under the IHRA.

First, Plaintiff may proceed under the burden-shifting framework the Supreme Court developed in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). Under *McDonnell Douglas*, a

plaintiff must first establish a prima facie case by showing that: "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021); *see also Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021). Once the plaintiff establishes a prima facie case, the burden then "shifts to the employer to offer a nondiscriminatory motive"; if the employer does this, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir. 2020), *reh'g denied* (July 31, 2020)).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit introduced an alternative to the *McDonnell Douglas* framework. *See Palmer v. Ind. Univ.*, 31 F.4th 583, 589 (7th Cir. 2022). Under *Ortiz*, this Court asks simply "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] . . . caused the discharge or other adverse employment action" at issue. 834 F.3d 760, 765 (7th Cir. 2016); *see also Nigro v. Ind. Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022). Under *Ortiz*, courts assess the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Lewis*, 36 F.4th at 760. The Seventh Circuit's decision in *Ortiz*, however, "did not alter '*McDonnell Douglas* or any other burden-shifting

23

framework.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 766).

Because Plaintiff proceeds under both the *McDonnell Douglas* burden-shifting framework and the *Ortiz* holistic framework, *see* [113] at 13–15m this Court will assess the evidence under both.

### A. *McDonnell Douglas*

It is undisputed that Plaintiff meets the first and third elements of the prima facie *McDonnell Douglas* test: (1) Plaintiff falls into one or more statutorily protected activities on account of his perceived race, his religion, and his national origin; (2) and he suffered a cognizable adverse employment action, termination. Plaintiff's prima facie case fails, however, on the third and fourth elements because Plaintiff does not identify a similarly-situated comparator who Defendant treated more favorably and he did not meet Defendant's expectations.

On comparator evidence, a "suitable comparator is an employee who is directly comparable to the plaintiff "in all *material* respects." *Palmer*, 31 F.4th at 590 (internal quotation marks and citation omitted). Generally, Plaintiff "must at least show that the comparators . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Khowaja v. Sessions*, 893 F.3d 1010, 1016 (7th Cir. 2018) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Of course, the comparator must not be a member of Plaintiff's protected classes. *Igasaki*, 988 F.3d at 957.

Here, the only suitable comparator either party identifies is Emmett, a Caucasian, American-born, non-Muslim who Defendant hired as a Special Agent at the same time as Plaintiff and who shared the same supervisor, Jeffrey Savage, as Plaintiff. DSOF ¶ 12. Defendant did not, however, treat Emmett more favorably than Plaintiff. Rather, Defendant fired Emmett on the same day as Plaintiff for the same reason Defendant fired Plaintiff—threatening to kill their coworkers at the casino night event. *See Feaster v. Greyhound Lines, Inc.*, 173 F. App'x 499, 502 (7th Cir. 2006) (holding that the plaintiff had no evidence that a comparator was treated more favorably where the plaintiff's alleged comparator "receive a similar performance review" and was "paid a virtually identical raise and salary" and "was also fired at about the same time").

Recognizing his insufficient comparator evidence, Plaintiff vaguely argues that "[o]utside of these two individuals [Plaintiff and Emmett], no other BNSF Special Agents were accused of violating BNSF's workplace violence policy." [115] at 14. But he does not, as he must, identify other Special Agents who engaged in similar conduct (making violent threats in the workplace) and received lighter discipline or no discipline from Defendant. *See Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 606 (7th Cir. 2022) (noting that it is the plaintiff's burden to identify a specific proper comparator). Plaintiff complains that this Court precluded him from obtaining discovery about other employees who violated Defendant's code of conduct and who were arrested, charged, and/or convicted of a misdemeanor and/or felony criminal offense. [115] at 14 n.5. The Court denied this discovery because there is no

indication that Plaintiff was himself ever arrested, charged, or involved with a criminal offense, and thus evidence about how Defendant treated other employees with criminal backgrounds was irrelevant to the similarly situated comparator inquiry, which looks at whether Plaintiff and a comparator share enough commonalities to offer a "*meaningful* comparison." *Abebe*, 35 F.4th at 607; *see* [48] at 9.

This Court, however, allowed Plaintiff the full opportunity to develop properly tailored comparator evidence. *See Brown v. Shinseki*, 892 F. Supp. 2d 1019, 1035 (N.D. Ill. 2012) ("In the context of disciplinary action, the Court usually relies on evidence that the employees engaged in similar conduct, were subject to the same performance standards, and dealt with the same supervisor."). Indeed, with Defendant's agreement, the Court allowed Plaintiff to obtain documents and information about "any officer alleged to have made any threat of violence from January 2013 to July 2017," noting that for "any Special Agent (other than Plaintiff and Bob Emmett) alleged to have violated BNSF's workplace violence policy, Defendant agrees to provide the information and documents sought related to the Special Agent's alleged threat and BNSF's disciplinary response, as well as the Special Agent's personnel file." [48] at 8. Any suggestion by Plaintiff that the Court deprived him of the opportunity to discover comparators is not accurate.

Plaintiff's prima facie case also fails on the second element because Plaintiff did not meet employer expectations. In cases like this, the question of whether Plaintiff met employer expectations overlaps with the question of pretext; that is, if

26

Plaintiff made threats of violence, he was not meeting Defendant's expectations *and* Defendant possessed a legitimate, non-discriminatory reason for firing him. *See Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022) (finding "the question of pretext and employer expectations" overlapping because the plaintiff "was not meeting [employer]'s legitimate expectations if she was making threats and refusing to follow company rules. These are non-discriminatory reasons for termination."). In the employment context, pretext "means a lie, specifically, a phony reason for some action." *Chatman*, 5 F.4th at 746 (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). If the employer "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022). Here, Defendant possessed a legitimate, non-pretextual reason for terminating Plaintiff because it believed that Plaintiff's threats of violence violated the company's codes of conduct, rules, and general expectations.

More specifically, Defendant fired Plaintiff in July 2017, explaining in his termination letter that he was being let go for "failure to meet the company's conduct expectations for a BNSF police officer" due to his threats of violence at casino night. DSOF ¶ 47; [105] at 9. Matthews and Savage, believing Plaintiff and Emmett made these threats based on the totality of the investigation conducted by the human resources department, made the decision to terminate them, as was Defendant's right. Threatening violence in the workplace indisputably gives an employer a legitimate, non-discriminatory reason for termination. *See Brooks*, 39 F.4th at 435.

Plaintiff offers no evidence from which this Court could find that Defendant's proffered reason for terminating him—his threat of violence—was pretextual. Plaintiff maintains his innocence of making threats and denies that he made any comments about wanting to kill his coworkers at casino night; he also emphasizes that he told Sanchez the same during her investigation. [115] at 2, 8. Plaintiff also cites to Holland's testimony that she did not feel threatened by Plaintiff. *Id.* at 7–8. However, for the purposes of the pretext inquiry, it "does not matter if [Plaintiff]'s words should have been perceived as threats or whether they even occurred; the only question is whether the employer honestly believed it had a non-discriminatory reason for termination—that is, that Plaintiff made threats." *Brooks* 39 F.4th at 436. Plaintiff's denials do not raise an inference that Defendant did not honestly believe that Plaintiff made the threatening comments.

Nor does Plaintiff persuasively argue that Defendant offered "shifting factual accounts and explanations" for terminating him. [115] at 15. Shifting "and inconsistent explanations can provide a basis for a finding of pretext," but "the explanations must *actually* be shifting and inconsistent to permit an inference of mendacity." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (emphasis added); *see also McCann v. Badger Mining Corp.*, 965 F.3d 578, 590 (7th Cir. 2020). The record forecloses any inference of pretext based on shifting explanations for Plaintiff's termination because there are no inconsistencies. Defendant's termination letter to Plaintiff informed him that the "the principle [*sic*] cause is your failure to meet the company's conduct expectations for a BNSF police

officer." DSOF ¶ 47. Later, Defendant explained at the end of Plaintiff's disciplinary hearing that Plaintiff's conduct violated two of the company's rules governing employee conduct, Employee Safety Rule 28.6 and Resource Protection Code of Conduct Rule 4.0, and that under PEPA, Plaintiff's threat of violence warranted stand-alone dismissal without progressive discipline. *Id.* ¶ 52. These are not inconsistent explanations. The initial termination letter explained in broad terms that Plaintiff's conduct fell below company expectations, and Defendant later provided more detail about which policies and codes of conduct it honestly believed Plaintiff violated. These explanations "are not mutually exclusive." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 631 (7th Cir. 2018).

Plaintiff next contends that Little spearheaded his termination due to her annoyance and irritation with him at casino night. [115] at 7–8. Plaintiff speculates that Little reported Plaintiff not out of legitimate concern that he was threatening violence but because she was offended that Plaintiff and Emmett did not know her boss Chief Sandsness "when she referred to him by his first name." *Id.* at 8. Putting aside the speculative nature of this argument and construing the facts in the light most favorable to Plaintiff, the notion that Little did not like Plaintiff or that she was "making [his] life . . . more difficult" does not support a reasonable inference that Little targeted Plaintiff due to his religion, national origin, or race. *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011). The record, moreover, undermines Plaintiff's conjecture that Little was peeved at Plaintiff for not knowing Chief Sandsness. Rather, Little possessed a legitimate concern about Plaintiff's comments.

She reported Plaintiff immediately after hearing from Holland about Plaintiff's comments at casino night. PSAF ¶¶ 14, 18. Little testified that if "someone says they're going to kill anybody anywhere, whether it's in casino night or down the street, in the world we live in you don't take that lightly," and that Holland told her Plaintiff's comments made her "nervous" even if she did not know if they were joking or not. [104-9] at 10. Simply put, the evidence reflects that Little reported Plaintiff because she was honestly concerned about the threat of violence. There is no evidence that Little reported Plaintiff because she was irritated or annoyed at him, much less that she reported Plaintiff for discriminatory reasons. Plaintiff's speculation otherwise fails to create an inference of discriminatory intent. *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (instructing that the plaintiff is "not entitled to the benefit of inferences that are supported only by speculation or conjecture"); *see also Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 812 (7th Cir. 2011) (explaining that "wholly conclusory beliefs" that a plaintiff has been discriminated against does not create a triable issue of fact); *Anderson v. Ill. Cent. R.R. Co.*, No. 17-CV-1387, 2019 WL 1438567, at *14 (N.D. Ill. Mar. 31, 2019) ("Plaintiff's conclusory allegation that he felt like Duncan looked at and spoke to him and others because of their nationality is insufficient to create an inference of discrimination at the summary judgement stage.").

This Court is also unpersuaded by Plaintiff's contention that Little triggered his unlawful termination because, even though she had no formal decision-making power, she "had [the] ear" of Sandsness and Matthews. [115] at 9–10. This Court

presumes that Plaintiff invokes the "cat's paw" theory of discrimination, which applies where a "subordinate without decision-making authority has such influence over the decisionmaker that she is able to use her discriminatory actions to manipulate the decisionmaker into taking the adverse employment action." *Brooks*, 39 F.4th at 439. To prevail on a cat's paw theory, however, Plaintiff must show both that Little "actually harbored discriminatory animus against him" and that Little's input proximately caused his termination. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019). As discussed, Plaintiff offers no evidence that Little harbored any discriminatory animus against Plaintiff. Nor does Plaintiff show that Little's input proximately caused Plaintiff's termination. Proximate causation does not lie where the employer possessed "independently sufficient reasons, such as corroboration of the allegations," to "take the adverse action," *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 462 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 401 (2021), and here, Defendant's ultimate decision-makers, Matthews and Savage, relied on not only Little's reports but on the summaries from interviews and the totality of the evidence from the company's internal investigation (which included more than Little's accounts) to terminate Plaintiff. The cat's paw theory is thus inapplicable here.

Plaintiff also suggests that this Court could infer pretext from the facts that: (1) no one approached Plaintiff at the AOT conference with concern about violence; (2) Defendant allowed Plaintiff to carry a firearm for thirty-three days after Little reported her concerns about Plaintiff's comments; and (3) Defendant did not contact authorities to initiate a criminal investigation. [115] at 8. These pieces of evidence do

not raise an inference of discriminatory motive; they demonstrate only that Defendant conducted a full investigation before relieving Plaintiff of his duties and responsibilities. Further, this Court does not second-guess the propriety of an employer's investigation or discipline, nor the way it arrived at the discipline. As the Seventh Circuit instructs, evaluating the "wisdom or propriety of an employer's discipline is a distraction." *Brooks*, 39 F.4th at 438.

Because Plaintiff produces no evidence supporting similarly-situated comparators and that he met his employer's legitimate expectations, he fails to demonstrate a *prima facie* case under *McDonnell Douglas*.

### B. *Ortiz*

Under *Ortiz*'s approach to view the evidence holistically, this Court similarly finds no triable issue on discrimination. As discussed, Defendant possessed a non-discriminatory, legitimate reason for terminating Plaintiff, and Plaintiff presents no evidence from which a rational jury could find that Defendant terminated Plaintiff because of his religion, national origin, or race. *See, e.g.*, *Graham v. Caterpillar, Inc.*, No. 20-CV-1400-JES-JEH, 2022 WL 4225386, at *7 (C.D. Ill. Sept. 13, 2022) (finding "that the result is the same" under an *Ortiz* holistic analysis where the plaintiff has not identified any evidence under *McDonnell Douglas* that he suffered an adverse employment because of his race); *Earl v. Jewel Food Stores, Inc.*, No. 18 C 8279, 2022 WL 5183146, at *9 (N.D. Ill. Oct. 5, 2022) (granting summary judgment on race discrimination claim because there "is simply nothing in the record that would allow a reasonable jury to conclude that [plaintiff] was terminated because of his race").

For these reasons, this Court grants summary judgment to Defendant on Plaintiff's IHRA discrimination claim in Count I.

## II.     Retaliation

This Court next assesses whether Plaintiff raises a triable issue on his retaliation claim. To survive summary judgment on this claim, Plaintiff must present evidence of: (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Abebe*, 35 F.4th at 607. The "evidence presented 'must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded." *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Ortiz*, 834 F.3d at 765). The inquiry boils down to one question: Does the record contain sufficient evidence to permit a reasonable factfinder to conclude that retaliatory motive caused the materially adverse action? *Id.*

On the element of causation, Plaintiff must show that Defendant would not have taken the adverse action but for his protected activity. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Plaintiff can meet his burden on causation by presenting direct evidence of retaliation in the form of admissions, or alternatively, by pointing to circumstantial evidence, "including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of [retaliatory] intent might be drawn." *Scaife v. U.S. Dep't of Veterans Affs.*,

49 F.4th 1109, 1118 (7th Cir. 2022); *see also Huff v. Buttigieg*, 42 F.4th 638, 646 (7th Cir. 2022). Defendant may rebut the inference of causation "with evidence of a nondiscriminatory explanation for the challenged action," after which the burden returns to [Plaintiff] to show that the . . . nondiscriminatory explanation is pretextual." *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 634 (7th Cir. 2022).

Plaintiff maintains two theories in support of his retaliation claim: (1) Defendant terminated him in retaliation for complaining about race and religion discrimination in June 2017 during Sanchez's investigation; and (2) Defendant refused to restore him to a Special Agent position and/or refused to hire him for open positions in 2020 and 2021 in retaliation for filing an EEOC charge and a complaint in this Court. [115] at 4–10, 11–13. This Court will address each theory in order below.

## A.    Retaliatory Termination

This Court begins with Plaintiff's theory that Defendant terminated him in retaliation for complaining about discrimination during his interviews with Sanchez.

Initially, Defendant requests that this Court disregard Plaintiff's theory of retaliatory termination. [119] at 10–11. Defendant's request rests on the procedural history of the case. Plaintiff's original complaint raised two claims—discrimination and retaliatory discharge, both under Illinois law. [1]. After the Court dismissed the retaliatory discharge claim, discovery proceeded on only the discrimination claim. *See* [13]. Thereafter, Plaintiff sought leave to add a Title VII retaliation claim based on Defendant's alleged failure to reinstate him after the arbitrator's ruling. [68] at 2. At

that time, he did not request leave to alleged retaliatory discharge. *See id*. After this Court allowed amendment, Plaintiff filed his amended complaint. [71]. According to Defendant, it did not realize until recently that the amended complaint included two theories of retaliation: one based on the failure to reinstate (which the Court expressly allowed) and one based on the retaliatory discharge. *See also id.* ¶ 30 (alleging that "Plaintiff's discharge from his employment was also in retaliation for and a direct result of the Plaintiff's reporting that his employer was violating the above statutes [IHRA and Title VII] and clearly mandated public policies of the State of Illinois and of the United States"). Defendant, however, did not move to strike these allegations and cannot complain now of being surprised by this retaliatory discharge theory. The amended complaint has been on file since February 2021. Thus, this Court will not disregard Plaintiff's retaliatory discharge theory. As discussed below, however, the theory fails to withstand summary judgment.

On Plaintiff's retaliatory discharge theory, the parties do not dispute that Plaintiff has established the first two elements of retaliation: engaging in a statutorily protected activity and materially adverse action. *Abebe*, 35 F.4th at 607. According to Plaintiff, he complained about race and religious discrimination to Sanchez and Savage, *see* PSAF ¶ 24, and Defendant terminated him. His complaint about discrimination constitutes a statutorily protected activity, *McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022) ("A complaint of discrimination is a protected activity . . . if the discrimination is based on a protected characteristic like race.") (quotation omitted), and termination qualifies as a materially adverse action,

*see West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022). Where Plaintiff falls short, however, is demonstrating a triable issue of fact on the element of causation, which requires him to prove Defendant's retaliatory motive was a but-for cause of his termination. *Lesiv*, 39 F.4th at 915.

Plaintiff relies on circumstantial evidence to raise an inference of causation. He raises suspicious timing—namely, that Defendant terminated him on July 9, 2017, a little over a month after Plaintiff complained about discrimination during his interviews on June 1 and 5, 2017. [115] at 7. But the Seventh Circuit has cautioned that "the order of events is even more important than the time between them." *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010). Here, the timing of Defendant's termination is not suspicious because Defendant initiated its investigation of Plaintiff for his threatening comment before Plaintiff complained of discrimination. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) (finding no inference of retaliation based on suspicious timing because the plaintiff's alleged protected conduct came *after* decisionmakers "began discussing ways to discipline" the plaintiff). Additionally, courts typically allow no more than a few days to elapse between the protected activity and adverse action to draw an inference of causation solely on a suspicious-timing argument. *Igasaki*, 988 F.3d at 959. Here, more than one month elapsed between Plaintiff's complaints in early June to his termination in early July 9; thus, he must present additional corroborating evidence of retaliatory intent. *See id.*; *Lesiv*, 39 F.4th at 921; *Jokich*, 42 F.4th at 634

(explaining that suspicious timing alone "is generally insufficient to establish a retaliatory motivation"). He does not.

Plaintiff asks this Court to infer retaliatory animus from the same "shifting explanations" theory he advanced in support of his discrimination claim, specifically, that while Defendant in its initial termination letter never stated that it found Plaintiff in violation of the company's "workplace violence policy," it found after the disciplinary hearing that Plaintiff must be dismissed in accordance with PEPA. [115] at 9; DSOF ¶¶ 51, 52. Plaintiff suggests that this "change of theory" supports an inference of illegal motive. [115] at 9. But there is no such "change of theory." As discussed above in the context of the discrimination claim, Plaintiff's termination letter broadly informed him that "the principle [*sic*] cause is your failure to meet the company's conduct expectations for a BNSF police officer." DSOF ¶ 47. This broad statement is not inconsistent with Defendant's later finding, after considering the evidence at the disciplinary hearing, that Plaintiff's conduct violated Employee Safety Rule 28.6 and Resource Protection Code of Conduct Rule 4.0, and that those violations warranted stand-alone dismissal in accordance with PEPA for making threat of violence in the workplace. DSOF ¶¶ 51, 52. Both the termination letter and Defendant's disciplinary finding focus on the same underlying conduct—Plaintiff's threats of violence during casino night—and thus are not inconsistent. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015) (noting that an employer's "flux in terminology" is not evidence of pretext where different explanations focused on

"same underlying conduct") (quoting *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997)).

Plaintiff also unpersuasively argues that Sanchez and corporate leadership "failed to follow the PEPA policy for discipline matters involving less than serious or stand-alone violations." [115] at 10. Plaintiff correctly recognizes that "[s]ignificant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of [illegal] intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012). Plaintiff, however, fails to explain how Defendant deviated from established policies. It is undisputed that PEPA provides for stand-alone dismissal, without need for progressive discipline, when the company finds after a disciplinary hearing that an employee has engaged in threats of workplace violence. DSOF ¶¶ 51, 52; [104-16] at 9–10. Plaintiff himself concedes that serious violations of company rules, policies, and codes of conduct, including engaging in or threatening violence, can result in immediate termination, even for employees who do not have any prior discipline. DSOF ¶ 8; PRSOF ¶ 8. Defendant's choice of terminating Plaintiff, rather than allowing him more progressive discipline, is not a deviation from company policy. Plaintiff appears to suggest that his behavior was not all that serious because he was only joking, not making true threats of violence, and Defendant should not have taken the drastic step of terminating him. *See, e.g.*, [115] at 8 (arguing that Savage knew that the complaints of Plaintiff's threats were "blown out of proportion"), 9 (arguing that Sanchez knew Plaintiff's threats were made in jest). That again misses the point. Defendant honestly believed that Plaintiff made

these threats, whether in jest or not, and made the business decision to terminate Plaintiff. This Court does not second-guess Defendant's legitimate business decision. *See Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 940 (7th Cir. 2022) (noting that "it is not the court's concern that an employer may . . . be too hard on its employee") (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)).

Plaintiff points out that in her first drafts of her investigation findings dated June 15 and 23, 2017, Sanchez suggested that Plaintiff and Emmett be given less severe forms of discipline—formal letter of reprimand, coaching and counsel—rather than termination. [115] at 9; PSAF ¶ 25; *see* [117-1]. It is not clear to this Court what Plaintiff believes this fact suggests as it relates to his retaliation claim. Hypothetically, a fact-finder might draw an inference of retaliation if Sanchez recommended lesser discipline *before* Plaintiff engaged in his statutorily protected activity (complaining about discrimination) on June 1 and 5, and changed her recommendation to termination after hearing those complaints. But here, Sanchez's drafts recommending lesser discipline came on June 15 and 23 *after* interviewing Plaintiff on June 1 and 5, when he complained of discrimination; thus, the necessary link to protected activity is missing. *See Hutt v. AbbVie Prods., LLC*, 757 F.3d 687, 694 (7th Cir. 2014). Moreover, Sanchez's testimony makes clear that these recommendations were merely initial working drafts. As to the first draft dated June 15, Sanchez emphasized that it was "not complete" and "not accurate" in that she had not interviewed all witnesses and had not completed her investigation. *Id.* at 46–47. Likewise, Sanchez testified that the second draft dated June 23 did not reflect her

"ending recommendation" and that she did not submit it to anyone "as my recommendation of final input"; it was simply "a draft" that she was working on. [104-17]. Plaintiff presents no evidence suggesting that Sanchez later "changed her mind" to support Plaintiff's termination for retaliatory purposes.

Plaintiff also asks this Court to infer nefarious intent from Sanchez's alleged failure to conduct a complete investigation, arguing that Sanchez failed to obtain certain emails or portions of emails involving Holland's accounts of casino night events. [115] at 9. Again, it is unclear what relevance this evidence bears to Plaintiff's retaliation claim; if there is a causal nexus between Sanchez's purported failure to obtain certain emails and Plaintiff's complaints of discrimination, Plaintiff has not explained what it is. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (explaining that perfunctory and undeveloped arguments are waived). Regardless, even if Sanchez failed to obtain certain statements that Holland made (a point that Defendant vehemently disputes, *see* DRSAF ¶ 19), that does not demonstrate retaliatory intent, or even that Sanchez conducted a poor investigation. It is undisputed that Sanchez interviewed Holland and obtained her account of casino night there; during that interview on June 5, Holland told Sanchez that Plaintiff and Emmett complained extensively about their positions and the training and had made threats that they would kill "the guys they were training with." DSOF ¶ 36. The record provides no basis for this Court to infer that Sanchez failed to conduct a full and fair investigation, much less that she did so because she was motivated by retaliation.

40

In sum, the record contains no evidence that Defendant terminated Plaintiff out of retaliation for complaining about discrimination. This Court therefore grants summary judgment to Defendant on Plaintiff's retaliatory termination theory in Count II.

## B. Failure to Reinstate/Hire

Defendant also moves for summary judgment on Plaintiff's claim that Defendant retaliated against him for engaging in statutorily protected activity by refusing to reinstate him and/or rehire him as a Special Agent. [105] at 14; *see* [115] at 11. This Court agrees that summary judgment is proper because Plaintiff adduces no evidence of a causal nexus between his protected activity and Defendant's actions.

On the failure to reinstate theory, Plaintiff asserts that Matthews refused reinstate Plaintiff to his former position of Special Agent following the arbitrator's December 2019 decision in retaliation for Plaintiff's charge of discrimination with the IDHR in August 2017. *Id.* at 11; PSAF ¶ 2. Assuming that Plaintiff meets the first two elements of retaliation (statutorily protected activity; materially adverse action), Plaintiff nonetheless fails to raise a triable issue on the third element of causation.

Initially, Defendant had no obligation following the arbitrator's ruling to reinstate Plaintiff specifically to his prior position of Special Agent. The arbitrator ordered only that Plaintiff be placed in "*scheduled service*." DSOF ¶ 54 (emphasis added). As Defendant established through Merrell's unrebutted declaration, as of February 2020 (when Plaintiff was determined medically fit for duty following the arbitrator's ruling), Defendant had no scheduled position available for Plaintiff to

hold. [104-16] ¶ 16. Because Defendant had no scheduled position for Plaintiff to hold, it placed Plaintiff on furlough status, as is its practice when it cannot place an employee in a position for which that employee is qualified. *Id.* ¶ 21. Plaintiff offers no evidence that Defendant's furlough contravened the arbitrator's ruling to return him to "scheduled service." In fact, when Plaintiff sought further review of Defendant's decision to place him on furlough status, in 2020, the arbitrator in an "interpretation" to his initial ruling, determined that Defendant acted within its right to furlough Plaintiff because it had no scheduled positions open. DSOF ¶ 59. And even if Defendant did not comply with the arbitrator's ruling when it placed Plaintiff on furlough, there is no evidence that Defendant's conduct qualifies as retaliatory. The only evidence relevant to Plaintiff's failure to reinstate theory shows that Matthews was "aware" that Plaintiff filed a charge of discrimination shortly after he filed it in August 2017. PSAF ¶ 38. Plaintiff does not, however, connect Matthews' awareness of Plaintiff's charge to any evidence indicating that Matthews was motivated by this charge to retaliate against Plaintiff by placing him on furlough. The lack of causation evidence dooms Plaintiff's failure to reinstate theory.

Equally unavailing is Plaintiff's theory that Defendant retaliated against him for filing an EEOC complaint by refusing to hire him for the Special Agent positions to which he applied in 2020 and 2021. PSAF ¶ 2. Again, the record is deficient on the element of causation. Plaintiff applied to three Special Agent positions—in September 2020, May 2021, and September 2021. DSOF ¶ 60. None of these applications advanced past initial review. [104-21] ¶ 11. Defendant's human

resources department rejected the first two of these applications because Plaintiff designated himself as an "external," not "internal" candidate, and the human resources department expects furloughed employees to identify themselves as "internal" candidates when they apply. *Id.* ¶¶ 12–14. Plaintiff's third application also failed to advance past initial review due to Plaintiff's response to a qualifying question that rendered him automatically ineligible for the position. *Id.* ¶¶ 15–16. Plaintiff presents no evidence that anyone from the company rejected any of these due to illegal animus. There is no indication that the employees in the human resources department knew about Plaintiff's EEOC complaint (or any other complaints of discrimination) when they rejected Plaintiff's three applications on initial review. The missing causal nexus forecloses Plaintiff's retaliation claim based on a failure to hire. This Court therefore grants summary judgment to Defendant on Plaintiff's retaliation claim in Count II.

## CONCLUSION

For the reasons explained above, this Court grants Defendant's motion for summary judgment [103], grants Defendant's motion to strike [116], and directs the Clerk to enter judgment in Defendant's favor. Civil case terminated.

Dated: November 3, 2022

Entered:

_Mary M Rowland_

Mary M. Rowland
United States District Judge

43